**LABATON KELLER SUCHAROW LLP**
Jonathan Gardner (*pro hac vice* forthcoming)
Carol C. Villegas (*pro hac vice* forthcoming)
Jonathan D. Waisnor (*pro hac vice* forthcoming)
James M. Fee (*pro hac vice* forthcoming)
Danielle Izzo (*pro hac vice* forthcoming)
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Fax: 212-818-0477

*Attorneys for Plaintiffs and the Proposed Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SCOTT BERNSTEIN, GINA GREEDER, AND JAMES LONERGAN, individually and on behalf of all others similarly situated, <br><br>                  Plaintiffs, <br><br>     v. <br><br> COINBASE GLOBAL, INC. AND COINBASE, INC., <br><br>                  Defendants. | Case No. 1:25-cv-5313 <br><br><br> <u>Class Action</u> <br><br> **<u>Jury Trial Demanded</u>** |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... 1

INTRODUCTION ................................................................................................................... 2

PARTIES ................................................................................................................................ 3

JURISDICTION AND VENUE ............................................................................................... 3

FACTUAL AND LEGAL ALLEGATIONS ............................................................................ 4

I.      BIOMETRICS AND CONSUMER PRIVACY .................................................... 4

II.     THE BIOMETRIC INFORMATION PRIVACY ACT ....................................... 7

III.   COINBASE GENERATES, COLLECTS, STORES, RETAINS, AND SHARES THE BIOMETRIC IDENTIFIERS OF COINBASE USERS IN VIOLATION OF ILLINOIS LAW ............................................................................................... 10

      A.    The Coinbase Cryptocurrency Exchange Platform and Identify Verification Process ................................................................................................. 10

      B.    Coinbase's Use of Third-Party Facial Recognition Software .............................. 14

      C.    Coinbase Never Requested Nor Received Users' Consent ................................... 18

IV.   COINBASE IS VICARIOUSLY LIABILE FOR THE THIRD PARTY VERIFICATION PROVIDERS' COLLECTION OF BIOMETRIC DATA .................. 19

V.     COINBASE'S REFUSAL TO ARBITRATE PLAINTIFFS' CLAIMS ......................... 20

CLASS ALLEGATIONS ....................................................................................................... 21

FIRST CAUSE OF ACTION  Violation of the Illinois Biometric Information Privacy Act (740 ILCS 14/15(a)) .......................................................................................... 24

SECOND CAUSE OF ACTION  Violation of the Illinois Biometric Information Privacy Act (740 ILCS 14/15(b)) ................................................................................... 25

THIRD CAUSE OF ACTION  Violation of the Illinois Biometric Information Privacy Act (740 ILCS 14/15(d)) .......................................................................................... 27

FOURTH CAUSE OF ACTION  Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Based on Coinbase's BIPA Violation (815 ILCS § 505/10a(c)) 28

PRAYER FOR RELIEF ........................................................................................................ 29

JURY DEMAND ................................................................................................................... 30

Plaintiffs Scott Bernstein, Gina Greeder, and James Lonergan, individually and on behalf of all other similarly situated ("Class Members"), by and through their undersigned attorneys, bring this class action against Coinbase Global, Inc. and Coinbase Inc. (collectively, "Coinbase" or "Defendant") based on personal knowledge, where applicable, information and belief, and the investigation of counsel.

## INTRODUCTION

1.     Coinbase is a multinational publicly traded company operating a cryptocurrency exchange that allows investors to buy, sell, and transfer over 250 cryptocurrencies.  Founded in 2012, Coinbase is the largest cryptocurrency exchange in the United States regarding trading volume, with over 8.4 million monthly transacting users worldwide, 245,000 ecosystem partners, and reported revenue of $6.3 billion in 2024.

2.     The Coinbase website and mobile app (collectively, "Coinbase Platform") allow users to purchase, send, trade, and use crypto assets.  To access the Coinbase Platform consumers are required to create a Coinbase account and verify their identity.

3.     Coinbase's identity verification process uses facial recognition technology.  Specifically, Coinbase requires users to upload a picture of their government-issued ID and a "selfie" with assistance from its third-party vendors, Coinbase applies facial recognition technology to collect, analyze, measure, and catalog the composite distances between facial features like the nose, eyebrow, eyes, and chin, to verify the user's identity.  This conduct violates several laws, including Illinois' Biometric Information Privacy Act ("BIPA"), which was specifically enacted to regulate collecting, storing, and using biometric data with an array of notice, consent, and retention requirements.

4.     Coinbase's wholesale collection of faceprints from all of its account holders violates BIPA because Coinbase fails to (1) inform Plaintiffs in writing that their biometric

2

identifiers (face geometry and face scans) and biometric information (collectively "biometric data") were and are being generated, collected, stored, and disclosed; (2) obtain prior written consent from Plaintiffs before generating, collecting, storing, and disclosing their biometric data; (3) make publicly available the written policies, retention schedules, and guidelines applicable to its collection and retention of Plaintiffs' biometric data; and (4) obtain prior written consent before disclosing Plaintiffs' biometric data to third parties.

5.     Plaintiffs bring this class action for damages, injunctive relief, and other remedies for harm suffered.

## PARTIES

6.     Plaintiff Scott Bernstein is a natural person who is a Coinbase user and has uploaded a photo of his government ID and a "selfie" to the Coinbase Platform to verify his identity while residing in the State of Illinois.

7.     Plaintiff Gina Greeder is a natural person who is a Coinbase user and has uploaded a photo of her government ID and a "selfie" to the Coinbase Platform to verify her identity while residing in the State of Illinois.

8.     Plaintiff James Lonergan is a natural person who was a Coinbase user and uploaded a photo of his government ID and a "selfie" to the Coinbase Platform to verify his identity while residing in the State of Illinois.

9.     Defendant Coinbase is a Delaware corporation with its principal executive office at One Madison Avenue, Suite 2400, New York, NY 10010.  Coinbase conducts business throughout Illinois.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the

3

aggregate sum of the claims of the members of the putative class exceeds $5 million, exclusive of interests and costs, because Plaintiffs bring this action on behalf of a proposed class that is comprised of over one hundred (100) members, and because at least one member of the Class is a citizen of a different state than Defendant.

11.     This Court has personal jurisdiction over Coinbase because it conducts business throughout Illinois, including in this District, and Plaintiffs' claims arise out of and relate to Coinbase's conduct in this District.

## FACTUAL AND LEGAL ALLEGATIONS

### I.     BIOMETRICS AND CONSUMER PRIVACY

12.     "Biometrics" refers to measurable characteristics or processes used for identification.  As a characteristic, biometrics is defined as "a measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition."  As a process, biometrics is defined as "automated methods of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics."

13.     Biometrics are used to identify individuals based on unique, distinctive, and measurable characteristics or features known as "biometric identifiers."[1]

---

[1] "Biometrics: A general term used alternatively to describe a characteristic or a process: As a characteristic: A measurable biological (anatomical and physiological) and behavioral characteristic that can be used for automated recognition.  As a process: Automated methods of recognizing an individual based on measurable biological (anatomical and physiological) and behavioral characteristics." *Biometrics Foundation Documents,* NSTC Subcommittee on Biometrics (2009), http://www.dtic.mil/dtic/tr/fulltext/u2/a505048.pdf.; Sushma Jaiswal, *et al.*, *BIOMETRIC: CASE STUDY,* 2 J. GLOBAL RESEARCH IN COMPUTER SCIENCE 19 (Oct. 2011), https://www.rroij.com/open-access/biometric-case-study-19-49.pdf  ("A biometric is any measurable, robust, distinctive, physical characteristic or personal trait of an individual that can be used to identify, or verify the claimed identity of, that individual. Measurable means that the characteristic or trait can be easily presented to a sensor and converted into a quantifiable, digital format.  This allows for the automated matching process to occur in a matter of seconds."); Stephen Mayhew, *History of* Biometrics (Feb. 1,2018), https://www.biometricupdate.com/201802/history-of-biometrics-2; *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017) ("Biometrics" refers to "biology-based set[s] of measurements").

14.    "Biometric identifiers" are categorized by physiological and behavioral characteristics.  Examples include, but are not limited to, face or hand geometry, fingerprints, palm prints, irises, retinas, veins, and DNA sequences.  Behavioral based biometric identifiers "are apparent in a person's interaction with the environment, such as signatures, gaits, and keystroke,"[2] while "[v]oice/speech contains both behavioral features, such as accent, and physiological features, such as voice pitch."[3]

15.    Biometric technologies vary widely depending on the biometric identifier.  Modern biometric processes include:

a.    Face recognition;
b.    Fingerprint recognition;
c.    Hand geometry;
d.    Retina scan;
e.    Iris scan;
f.    Voice recognition;
g.    Vascular or vein recognition;
h.    Skin texture;
i.    DNA;[4]
j.    Dynamic signature verification;[5]
k.    Keystroke dynamics; and
l.    Gait analysis.

16.    One of the most prevalent uses of biometrics is in facial recognition technology, which records the "spatial geometry" or more commonly known as "facial geometry" of distinguishing features of the face.[6]  These distinguishing features include the nose, eyes,

---

[2] *Id.*
[3] *Id.*
[4] The National Biometrics Challenge, National Science and Technology Council Subcommittee on Biometrics and Identity Management, (September 2011) at 14 at:
https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/biometricschallenge2011.pdf.
[5] Stephen Mayhew, *Dynamic Signature*, Biometric Update, (June 20, 2012)
https://www.biometricupdate.com/201206/explainer-dynamic-signature.
[6] *Face Recognition*, Biometric Solutions, https://www.biometric-solutions.com/face-recognition.html.

eyebrows, mouth, chin, and lips.[7] **Figure 1** illustrates the way "face geometry" is commonly used to refer to the location and spatial relationships between the distinguishing features.



**Figure 1**

17.     Facial recognition technology works by: (1) scanning[8] a photograph and/or digital image to detect a human face, (2) extracting the distinguishing facial features, such as the nose, eyes, mouth, chin, ear, and their relative portions in the digital image that are based on specific details about the face geometry as determined by facial points and contours and their relative portions in the digital image, (3) generating a face "template," (or "faceprint"), and (4) comparing the resulting "face template" to the face templates stored   in a "faceprint database" for identification.[9]

---

[7] Jaiswal, *supra* note 3.

[8] A software program can be said to "scan" a digital image to detect a face by identifying key facial landmarks or features such as the nose, mouth, eyes and chin.  *See* P.N. Belhumeur, *Localizing Parts of Faces Using a Consensus of Exemplars,* 2011 IEEE Conference on Computer Vision and Pattern Recognition (CPVR) 545-552 (2011) ("Many fiducial point detectors include classifiers that are trained to respond to a specific fiducial (e.g., left corner of the left eye).  These classifiers take as input raw pixel intensities over a window or the output of a bank of filters (e.g., wavelets, Gaussian Derivative filters, Gabor filters, or Haarlike features).  These local detectors are scanned over a portion of the image and may return one or more candidate locations for the part or a "score" at each location.").

[9] Jaiswal, *supra* note 3.

18. The recent sophistication of facial recognition software has generated many commercial applications of the technology but has also raised serious privacy concerns about its massive scale, scope, and surreptitiousness.[10]

19. The use of biometric data presents unique risks. Biometric data is one of the most sensitive forms of personal information because—unlike other types of data such as account or ID numbers—biometric data cannot be changed if stolen or compromised. Once a person's unique and permanent biometric identifiers are exposed, she has no way to prevent identity theft and unauthorized tracking.

20. Proprietary biometric data collected by companies—especially those who collect it unlawfully and without permission—can be leaked, hacked, exposed, or otherwise exploited, as demonstrated by the highly publicized breaches of the Clearview AI scandal and the Cambridge Analytica scandal.

## II. THE BIOMETRIC INFORMATION PRIVACY ACT

21. Illinois enacted BIPA as an informed consent statute, specifically imposing safeguards to ensure that individuals' privacy rights and control over their biometric identifiers and biometric information are properly honored and protected and impose liability on private entities who fail to comply with the statutory requirements. 740 ILCS 14/1-99.[11]

22. The Illinois Legislature has found that "[b]iometrics are unlike other unique identifiers" such as social security numbers, which can be changed if compromised. 740 ILCS 14/5(c). "Biometrics . . . are biologically unique to the individual; therefore, once compromised,

---

[10] *What Facial Recognition Technology Means for Privacy and Civil Liberties: Hearing Before the Subcomm. on Privacy Tech & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012) (statement of Jennifer Lynch, Staff Attorney, Electronic Frontier Foundation), https://www.eff.org/files/filenode/jenniferlynch_eff-senate-testimony-face_recognition.pdf.

[11] BIPA governs the retention, collection, disclosure, and destruction of retained biometric identifiers or biometric information, and prohibits a private company from capturing, purchasing, receiving through trade, or otherwise obtaining biometrics without first informing the subject and obtaining written consent. *See* 740 ILCS 14/15(a)-(e).

the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions." *Id.*

23.    Thus, in 2008, to protect Illinois residents from the surreptitious collection and use of their biometric data, the Illinois Legislature enacted BIPA.[12]  In 740 ILCS § 14/15(a)-(b), BIPA provides:

> (a) A private entity in possession of biometric identifiers or biometric information must develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first. Absent a valid warrant or subpoena issued by a court of competent jurisdiction, a private entity in possession of biometric identifiers or biometric information must comply with its established retention schedule and destruction guidelines.

> (b) No private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

>> (1) informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

>> (2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

>> (3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

24.    BIPA further provides in 740 ILCS § 14/15(d)(1):

---

[12] In passing BIPA, the Illinois Legislature found that (1) "[a]n overwhelming majority of members of the public are weary of the use of biometrics when such information is tied to finances and other personal information" (740 ILCS § 14/5(d)); (2) "[t]he full ramifications of biometric technology are not fully known" (740 ILCS § 14/5(f)); and (3) "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information" (740 ILCS § 14/5(g)).

No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless:

(1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

25.     BIPA applies to entities that interact with two forms of biometric data: "biometric identifiers" and "biometric information." 740 ILCS § 14/15(a)-(e).

26.     BIPA defines "biometric identifier" to mean a "retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS § 14/10.  Moreover, biometric information is defined as "any information, *regardless* of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual."  *Id*. (emphasis added).

27.     Biometric identifiers are particularly sensitive, because "[a] person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition, at least not easily or not at this time.  Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen access code.  The Act's goal is to prevent irretrievable harm from happening and to put in place a process and rules to reassure an otherwise skittish public."  *Sekura v. Krishna Schaumburg Tan, Inc.*, 115 N.E.3d 1080, 1093 (Ill. App. Ct. 2018), *appeal denied*, 119 N.E.3d 1034 (Ill. 2019).

28.     Additionally, because biometric information includes more than simply biometric identifiers, "[t]he Act also bans the non-consensual collection and storage of *information . . . that is 'based on' those biometric identifiers*." *Rivera v. Google Inc.*, 238 F.Supp.3d 1088, 1090 (N.D. Ill. 2017) (emphasis added).

29.     Under BIPA, "[a] prevailing party may recover: (1) against a private entity that negligently violates a provision of this Act, liquidated damages of $1,000 or actual damages,

9

whichever is greater; (2) against a private entity that intentionally or recklessly violates a provision of this Act, liquidated damages of $5,000 or actual damages, whichever is greater; (3) reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses; and (4) other relief, including an injunction, as the State or federal court may deem appropriate." *Id.* (emphasis added).

30.     Each part of Section 15 described above "imposes various duties upon which an aggrieved person may bring an action under section 20… as section 20 provides that a 'prevailing party may recover for each violation' (740 ILCS 14/20), a plaintiff who alleges and eventually proves violation of multiple duties could collect multiple recoveries of liquidated damages. *Id.* § 20(1), (2)." *Tims v. Black Horse Carriers, Inc.*, 184 N.E.3d 466, 473 (Ill. App. Ct. 2021). In other words, a separate "claim accrues under the Act with every scan or transmission of biometric identifiers or biometric information without prior informed consent." *Cothron v. White Castle Sys., Inc.*, 216 N.E.3d 918, 929 (Ill. 2023).

## III.    COINBASE GENERATES, COLLECTS, STORES, RETAINS, AND SHARES THE BIOMETRIC IDENTIFIERS OF COINBASE USERS IN VIOLATION OF ILLINOIS LAW

31.     In direct violation of BIPA, Coinbase generates, collects, stores, and discloses Plaintiffs' biometric identifiers, including face scans and faceprints, and biometric information such as facial geometry of Illinois residents without valid consent and without maintaining publicly available retention and destruction policies. Coinbase's intentional BIPA violations are evidenced by the functionality of the Coinbase Platform and its identity verification processes.

### A.     The Coinbase Cryptocurrency Exchange Platform and Identify Verification Process

32.     Coinbase is a multinational publicly traded company operating a cryptocurrency exchange that allows investors to swap, buy, sell, and transfer over 250 cryptocurrencies. Founded

in 2012, Coinbase is the largest cryptocurrency exchange in the United States regarding trading volume, with over 8.4 million active monthly users worldwide, 245,000 ecosystem partners, and reported revenue of $6.3 billion in 2024.

33.     Coinbase operates an online platform (i.e., website and mobile app (collectively, "the Coinbase Platform")) for storing, swapping, buying, selling, and transferring cryptocurrencies and nonfungible tokens ("NFTs").  Specifically, the "Coinbase Services" available to account holders include depositing cryptocurrencies from their other wallets or accounts with other exchanges directly into their Coinbase accounts;[13] "swapping" one cryptocurrency for another cryptocurrency without using dollars or other fiat currencies;[14] trading NFTs, including digital artwork;[15] storing, tracking, managing, buying, and selling their cryptocurrencies and NFTs;[16] trading futures on cryptocurrencies;[17] and maintaining a dollar balance to use primarily in transactions related to cryptocurrencies and NFTs.[18]

34.     To access the Coinbase Platform, users must first create a Coinbase account and verify their identity.[19]  To create an account, users must provide a wealth of personal information, including their name, date of birth, mailing address, email, and Social Security Number, and agree to the "Coinbase User Agreement" and privacy policy.  Only after the user's private information is submitted and the user's identity verified will an account be created.

---

[13] Coinbase Help, *Deposit Cryptocurrency (assets) on Coinbase Exchange*,
https://help.coinbase.com/en/exchange/crypto-transfers/funding-your-account-with-cryptocurrency.
[14] Coinbase Learn, *How to swap tokens with Coinbase Wallet*, https://www.coinbase.com/learn/wallet/how-to-swap-tokens-with-coinbase-wallet.
[15] Coinbase Learn, *How to buy an NFT on Coinbase NFT*, https://www.coinbase.com/learn/wallet/how-to-buy-an-NFT-on-Coinbase-NFT; *see also* https://www.coinbase.com/learn/crypto-basics/what-are-nfts (explaining that NFTs and cryptocurrencies are both based on blockchains, but that two tokens of the same cryptocurrency are identical, i.e., or fungible, unlike two NFTs on the same blockchain).
[16] Coinbase home page, https://www.coinbase.com/.
[17] Coinbase Blog, *US traders can now trade regulated leveraged futures through Coinbase Financial Markets*, https://www.coinbase.com/blog/us-traders-can-now-trade-regulated-leveraged-crypto-futures-through-coinbase.
[18] Coinbase home page, https://www.coinbase.com/.
[19] Coinbase Help, *Getting started with Coinbase*, https://help.coinbase.com/en/coinbase/getting-started/getting-started-with-coinbase/id-doc-verification.

35.     Next, users are prompted to verify their identity by uploading a "photo ID" issued by a government agency (i.e., a driver's license or other state-issued ID) and a "selfie" of the user in real-time.[20]  Coinbase then utilizes facial processing and recognition technology and software to confirm the user's identity ("Verification Process").[21]  Specifically, Coinbase's Verification Process first detects a face within the photo ID and the real-time image. Next, the software scans the identified face to locate and extract key landmark facial features, such as the location of the mouth, chin, nose, ears, eyes, and eyebrows, and calculate a unique digital representation of the user's face known as a face template or face scan.  The face scan is cross-referenced against the user's uploaded selfie to determine if they match.  Once the match is confirmed, Coinbase verifies the user to send and receive cryptocurrency through its platform.

36.     Conspicuously missing from the Verification Process is the necessary disclosures about – and consent to – Coinbase's biometric practices or its relationship with third party identity verification services (i.e., Jumio Corporation ("Jumio"), Onfido, Inc. or Onfido Ltd. (collectively, "Onfido"), Au10tix LTD ("Au10tix"), Solaris AG, or Liquid Co., Ltd. (collectively, "Third Party Verification Providers" or "TPVP")) that supply Coinbase with facial recognition software. For example, at no point during the Verification Process are Coinbase users asked to consent to the collection of their biometric information, notified that their biometric data will be collected by an unrelated third party, nor provided with any information about the process, how it works, the type of information and data collected, whether said data is stored or disclosed to other entities, or any information about the retention or destruction of their biometric information.  *See* **Figures 2-5**.

---

[20] Coinbase Legal, *User Agreement*, https://www.coinbase.com/legal/user_agreement/united_states.
[21] Coinbase Legal, *Third Party Verification Vendors*, https://www.coinbase.com/legal/privacy/third-party-verification-vendors; *see also* Jumio Press Release, *Jumio Records Largest Sales Quarter to Date, Extends its Leadership in Financial Services to the Bitcoin and ICO Markets*, https://www.jumio.com/about/press-releases/bitcoin-ico-markets/.



**Figure 2[22]**



**Figure 3**



**Figure 4**



**Figure 5**

37.     Consequently, users unwittingly hand over their highly sensitive biometric data to Coinbase and the Third-Party Verification Providers it uses for its Verification Process, whose very existence, let alone specific privacy terms, they are wholly unaware of.  This conduct is precisely what BIPA was enacted to prevent and is why the Illinois legislatures concluded that Illinois citizens must consent and understand (1) that a company is generating and collecting biometric data, (2) the name of the collecting entity, (3) if it will be disclosed and to whom, (4) the purpose of said collection, and (5) how long it will be retained.  Coinbase has completely disregarded its obligations under Illinois law.

**B.     Coinbase's Use of Third-Party Facial Recognition Software**

38.     Coinbase completes its Verification Process by utilizing facial recognition software supplied by its Third-Party Verification Providers, primarily Jumio and Onfido.

39.     Jumio specializes in validating and verifying users' identification documents through biometric-based authentication tools.[23]  Jumio's 3-step "Biometric Authentication" process automatically establishes the digital identities of users through "advanced face recognition and selfie technology [that] quickly and securely authenticates users and unlocks their digital identities in real time."[24]  *See* **Figure 6**.  Jumio's authentication system is crafted to seamlessly integrate into existing applications and workflows, functioning effectively on mobile and web-based platforms.

---

[23] Jumio, *The Jumio Platform Online Trust on your Terms*, https://www.jumio.com/kyx/.
[24] Jumio, *Authentication*, https://www.jumio.com/products/authentication/.



**Figure 6**[25]

40.     Jumio readily admits that its NetVerify software product generates and compares biometric information to verify a person.  Indeed, in discussing its software and necessary consent, Jumio's Vice President of Global Marketing, Dean Nicolls, stated that it is ultimately up to Jumio's customers (in this case, Coinbase) to obtain an end users' informed consent for the collection of biometrics.[26]  Nicolls stated that since Jumio implements its products onto a company's platform, it leaves control over messaging, and therefore informed consent for biometrics collection, in the hands of the company implementing it.[27]  Further Nicolls counselled that:

---

[25] *Id.*
[26] Chris Burt, *Jumio looks to settle biometric data privacy class action for $7M*, Biometric Update (Feb. 3, 2020), https://www.biometricupdate.com/202002/jumio-looks-to-settle-biometric-data-privacy-class-action-for-7m.
[27] *Id*.

"[f]or any of our customers, or really any customers out there that collect biometrics, there are two things that you need to do…"[f]irst you need to update the privacy policy on your website to reflect that they're collecting biometric information for a very specific purpose, which is identity verification. There's more nuance there and they have to contact their attorneys to come up with the right wording, but that's one thing that they need to do. The other part is they need to provide clear opt-out language before biometric [information] is actually captured."[28]

41. Onfido, like Jumio, provides biometric identification software intended to be seamlessly incorporated into its customers' products and mobile apps. Onfido boasts that its "[i]dentity verification technology helps establish the legitimate online identity of the people accessing [a company's] product or service."[29] "For KYC compliance and fraud prevention, businesses often use a document and biometric based solution. A user provides the business with an image of a photo ID to be analyzed for authenticity. They also provide a selfie taken at the moment of onboarding. AI is used to match the facial biometrics between the photo ID and selfie to provide the business with assurance that the identity document was submitted by its rightful owner, and not by a fraudster who may have illegally obtained the document."[30] Onfido further claims that use of its software will allow businesses to "onboard more customers," "prevent advanced fraud," and make onboarding a breeze.[31] *See* **Figure 7**. Indeed, Coinbase partnered with Onfido for this exact purpose. Onfido orchestrates identity verification workflows to match the unique requirements of the Coinbase Platform — combining a mix of document and biometric verification, trusted data sources, and passive fraud detection signals.[32] Coinbase users confirm their identity through Onfido by uploading a copy of their government ID and a selfie. Using

---

[28] *Id*.

[29] Onfido, *Digital identity made simple*,
https://onfido.com/?utm_source=google&utm_medium=cpc&utm_campaign=brand&gad_source=1&gclid=EAIaIQobChMI7aHIgPTNgwMV2l1HAR0xtADREAAYASAAEgIo5PD_BwE

[30] Onfido, *What is biometric verification?*, https://onfido.com/blog/what-is-biometric-verification/

[31] *Id*.

[32] Onfido, *Onboarding for digital banks*, https://onfido.com/industries/financial-services/digital-banking/

advanced facial scanning, Onfido compares the facial biometrics to the photo on the ID and selfie, and generates a score based on the similarity of the faces."[33]



**Figure 7**[34]

42.     Coinbase utilizes both Jumio's and Onfido's services by intentionally leveraging their advanced authentication systems to enhance the verification process for users on its platform. Moreover, in addition to Coinbase storing users' biometric data on its servers, it also allows Jumio, Onfido, and other Third-Party Verification Providers to review and store its users' biometric data.

43.     Coinbase integrated the Third-Party Verification Providers' software into its platform. Coinbase has complete and exclusive control over the biometrics collected using the Third-Party Verification Providers' software and stored on Coinbase's servers. To be clear,

---

[33] Onfido, *What is IDV?*, https://onfido.com/blog/what-is-idv/#:~:text=signs%20of%20fraud.-,Biometric%20verification,who%20they%20claim%20to%20be.
[34] Onfido, *Verification Suite*, https://onfido.com/tour/#/verification/biometric.

Coinbase controls: (1) whether biometric identifiers are collected; (2) which biometric identifiers are collected; (3) the type of biometrics that are collected; (4) which biometrics are saved; (5) whether information based on biometric identifiers is used to identify users (thus creating biometric information); (6) whether biometrics are encrypted or otherwise protected; and (7) how long biometrics are stored.

44.     A Coinbase user, in contrast, has no ability to control their biometrics.  The user has no control over whether biometrics are collected from the user's photo or government ID. Users cannot disable the collection of biometrics or limit what information is collected or from whom it is collected.  Thus, Coinbase fully controls—and thus possesses—the biometrics on Coinbase.

### C.     Coinbase Never Requested Nor Received Users' Consent

45.     BIPA prohibits private entities from collecting, capturing, or otherwise obtaining a person's biometric identifiers or information without the person's informed written consent.  *See* 740 ILCS 14/15(b).  The informed-consent regime bars the collection of biometric identifiers or information unless the collector first informs the person in writing of the specific purpose and length of term for which [data are] being collected, stored, and used and receives a written release[.]"  *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1150 (7th Cir. 2020) (internal citation omitted).

46.     Neither Coinbase nor the Third-Party Service Providers ever requested or obtained written consent from Coinbase users, nor were users ever informed if their biometric data was actually collected.

47.     Coinbase is liable to Plaintiffs under BIPA for failing to: (1) inform them of the purposes and duration for which it collects, stores, uses, and discloses their facial geometry or face scans; (2) inform them that it discloses or disclosed their facial geometry or face scans to at least

18

one Third Party Verification Provider who supplied Coinbase with facial recognition software and that the vendor maintains a biometric database for identification; (3) obtain their written consent before collecting their facial geometry; and (4) publish a written, publicly available policy identifying its retention schedule and guidelines for permanently destroying users' facial geometry and face scans.

## IV. COINBASE IS VICARIOUSLY LIABLE FOR THE THIRD PARTY VERIFICATION PROVIDERS' COLLECTION OF BIOMETRIC DATA

48.     Coinbase is vicariously liable under BIPA. Coinbase "obtains" biometric data in violation of Section 15(b) because it explicitly directed the Third Party Verification Providers to use its software to verify and authenticate users, including Plaintiffs, and its software does so by collecting biometric data.

49.     Section 15(b) of BIPA does not require that a defendant "possess" biometric data to trigger a violation. *Timmons v. Gemini Motor Transp., L.P.*, 2025 WL 964960 (N.D. Ill. Mar. 30, 2025). Courts have routinely found that Section 15(b) allows individuals to bring claims against companies that "hires someone else [] to obtain biometric data on its behalf." *See Rogers v. BNSF Ry. Co.*, 2022 WL 4465737, at *3 (N.D. Ill. Sept. 26, 2022); *see also Wordlaw v. Enter. Leasing Co. of Chi.*, 2020 WL 7490414, at *6 n.2 (N.D. Ill. Dec. 21, 2020) ("while BIPA is limited to 'private entities,' the text does not close the door on traditional theories of agency liability").

50.     Accordingly, under BIPA, Coinbase should be held vicariously liable for the Third Party Verification Providers' collection of Plaintiffs' biometric data because Coinbase directed the Third Party Verification Providers to do so on its behalf.

## V.     COINBASE'S REFUSAL TO ARBITRATE PLAINTIFFS' CLAIMS

51.     Counsel for Coinbase and a group of Coinbase customers represented by Labaton Keller Sucharow LLP ("Labaton") entered a tolling agreement related to the claims at issue in this Action on October 18, 2023.

52.     On March 6, 2024, 7,926 individuals filed individual demands for arbitration with the American Arbitration Association ("AAA") against Coinbase. On April 5, 2024, an additional 2,565 individuals, including Plaintiffs, filed individual demands for arbitration with AAA against Coinbase.

53.     The parties submitted letters to AAA concerning the appointment of a Process Arbitrator under AAA's Mass Arbitration Supplementary Rules. On June 28, 2024, AAA appointed William E. Hartsfield, Esq. to serve as the Process Arbitrator.

54.     Coinbase raised a laundry list of threshold issues, arguing, among other things, that (1) AAA should close the arbitrations and the cases should proceed in small claims court in Illinois, (2) the Plaintiffs should be required to participate in an individualized and futile pre-dispute resolution process that Coinbase had waived by reaching out to Plaintiffs' counsel, (3) the Plaintiffs should be required to submit new declarations, (4) the Plaintiffs' lead attorney should be required to submit a new declaration, and (5) the Plaintiffs should be required to amend their demands to provide more detailed allegations. Process Arbitrator Hartsfield denied these five request on December 31, 2024.

55.     However, Process Arbitrator Hartsfield declined to decide certain other issues presented to him by the parties, including the "batching" procedures that would apply to the arbitrations and the fees AAA would require the parties to pay.

56.     Accordingly, the parties submitted further correspondence to AAA concerning these administrative issues. On March 3, 2025, AAA determined that it would charge fees

according to its published fee schedule, rather than the fees purportedly imposed upon it by Coinbase's arbitration clause.

57.     The Plaintiffs promptly paid AAA the filing fees that AAA invoiced them. Coinbase, however, informed AAA that it would not pay the fees AAA required.

58.     On March 27, 2025, AAA inquired whether the Plaintiffs would pay the fees that Coinbase owed AAA and noted that it could decline to administer future arbitrations for Coinbase based on Coinbase's refusal to pay the fees it owed in their cases. AAA also explained that, if neither party paid the fees Coinbase owed, Plaintiffs would be free to pursue their claims in an appropriate court.

59.     On April 3, 2025, Plaintiffs advised that they would not pay AAA the fees Coinbase owed AAA.

60.     On April 16, 2025, the AAA administratively closed the arbitrations.

61.     As a result, the Parties' arbitration was considered had and Plaintiffs are able pursue their claims on the merits in Court.

## CLASS ALLEGATIONS

62.     **Class Definition:** Plaintiffs bring this action pursuant to the Federal Rule of Civil Procedure 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All residents of Illinois who had their biometric information and/or biometric identifiers, including their face geometry, collected, captured, used, transmitted, stored or otherwise obtained by Coinbase: (i) at any point in the five (5) years preceding the filing of the Complaint; or (ii) at any point in the five (5) years preceding the tolling agreement for the claims at issue in the Action entered into by counsel for Coinbase and Plaintiffs on October 18, 2023.

63.     Excluded from the Class are:

(a)     Any individual who provided notice to Defendant Coinbase of an intent to file a demand for arbitration, or filed a demand for arbitration against Defendants, alleging

allegations substantially similar to those contained herein, individually or through any firm other than undersigned counsel Labaton Keller Sucharow LLP, unless such notice of intent or demand has been withdrawn;

(b)     Any individual who has settled claims against Defendants based on allegations substantially similar to those contained herein;

(c)     Any Judge or Magistrate presiding over this action and any members of their immediate families;

(d)     The current or former employees, officers, directors, and control persons of each of the Defendants, and any members of their immediate families;

(e)     Plaintiffs' counsel, Defendants' counsel, or any counsel representing any individual described in subparagraph (a) of this paragraph above with respect to claims described in subparagraph (a) of this paragraph above; and

(f)     The legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.[35]

64.     **Numerosity:** Pursuant to Rule 23(a)(1), the number of persons within the Class is so numerous, believed to amount to thousands of persons, particularly given that Coinbase itself reports that it has more than 8.4M monthly transacting users that joinder of all members is impracticable.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Coinbase's records.

---

[35] Plaintiffs reserve the right to modify, change, or expand the Class definition or to define subclasses based upon discovery and further investigation.

65. **Commonality, Predominance, and Typicality:** Pursuant to Rule 23(a)(2)-(3) and Rule 23(b)(3), there are well-defined common questions of fact and law that exist as to all Class Members, and that predominate over any questions affecting only individual Class Members. The common legal and factual questions do not vary across Class Members, and may be determined without reference to the individual circumstances of any particular Class Member. These common legal and factual questions include, but are not limited to:

(a) Whether Coinbase collected or otherwise obtained Plaintiffs and Class Members' biometric identifiers or biometric information;

(b) Whether Coinbase properly informed Plaintiffs and Class Members that they collected, used, and stored their biometric identifiers or biometric information;

(c) Whether Coinbase obtained a written release (as defined in 740 ILCS § 14/10) to collect, use, and store Plaintiffs and Class Members' biometric identifiers and biometric information;

(d) Whether Coinbase used Plaintiffs and Class Members' biometric identifiers and biometric information to identify them; and

(e) Whether Coinbase's violation of BIPA were committed intentionally, recklessly, or negligently.

66. **Adequate Representation:** Pursuant to Rule 23(a)(4), Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this Action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiffs have raised viable

statutory claims of the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Complaint to include additional Class representatives to represent the Class, additional claims as may be proper, or to amend the Class definition or add a sub-class to address any steps that Defendants engaged in with respect to Plaintiffs and the Class Members' biometric identifiers and biometric information.

## **FIRST CAUSE OF ACTION**

### **Violation of the Illinois Biometric Information Privacy Act**
### **(740 ILCS 14/15(a))**

67.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

68.     BIPA mandates that companies that collect, capture or otherwise obtain biometric data establish and maintain a satisfactory policy for biometric data retention and deletion. Specifically, companies must: (1) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of an individual's biometric data (at most three years after the company's last interaction with the individual); and (2) adhere to that retention schedule and delete the biometric information. *See* 740 ICLS § 14/15(a).

69.     Defendants failed to comply with these BIPA mandates.

70.     Defendant Coinbase qualifies as a "private entity" under BIPA. *See* 740 ICLS § 14/10.

71.     Plaintiffs and the Class are individuals who have had their "biometric identifiers" collected by Defendants (in the form of their face scans or "selfies"), as explained in detail in Section III. *See* 740 ICLS § 14/10.

72.     Plaintiffs and the Class Members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ICLS § 14/10.

73.    Coinbase does not publicly provide a retention schedule or guidelines for permanently destroying Plaintiffs' biometric identifiers as specified by BIPA.  *See* 740 ILCS 14/15(a).

74.    Upon information and belief, Defendant lacks retention schedules and guidelines for permanently destroying Plaintiffs and the Class Members' biometric data, and has not and will not destroy their biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of an individual's last interaction with Coinbase.

75.    On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requires for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ICLS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ICLS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ICLS § 14/20(3).

## SECOND CAUSE OF ACTION

### Violation of the Illinois Biometric Information Privacy Act
### (740 ILCS 14/15(b))

76.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

77.    BIPA makes it unlawful for any private entity to, among other things,

　　　(b)    collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information, unless it first:

　　　　　(1)    informs the subject or the subject's legally authorized representative in writing that a biometric identifier or biometric information is being collected or stored;

(2) informs the subject or the subject's legally authorized representative in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

(3) receives a written release executed by the subject of the biometric identifier or biometric information or the subject's legally authorized representative.

740 ILCCS § 14/15(b).

78. Coinbase is a Delaware corporation and thus qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

79. Coinbase violated 741 ILCS § 14/15(b) in three ways by: (1) generating, (2) collecting, and (3) storing Plaintiffs' biometric data and information, including but not limited to their face geometry scans, without consent.

80. As explained in detail in Section I above, Plaintiffs' faceprints or face geometry are "biometric identifiers" pursuant to 740 ILCS § 14/10.

81. Coinbase systematically and automatically generated, collected, used, and stored Plaintiffs' biometric identifiers without first obtaining the specific written release required by 740 ILCS 14/15(b)(3).

82. As explained above, Coinbase did not properly inform Plaintiffs in writing that Plaintiffs' biometric identifiers were being generated, collected and stored, nor did it inform Plaintiffs in writing of the specific purpose and length of term for which these biometric identifiers were being collected, stored, and used, as required by 740 ILCS §§ 14/15(b)(1)–(2).

83. By generating, collecting, storing, using, and sharing Plaintiffs' biometric identifiers as described herein, Coinbase violated Plaintiffs' right to privacy of these biometric identifiers, as set forth in BIPA, 740 ILCS § 14/1, *et seq.*

84. Plaintiffs seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs by requiring Coinbase to comply with BIPA's requirements for the

collection, storage, and use of biometric identifiers; (ii) statutory damages of $5,000 for this intentional violation of 740 ILCS § 14/15(b) of BIPA pursuant to 740 ILCS § 14/20(2), or at minimum, $1,000 for this negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (iii) attorneys' fees and costs, including expert witness fees and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## THIRD CAUSE OF ACTION

### Violation of the Illinois Biometric Information Privacy Act
### (740 ILCS 14/15(d))

85.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

86.     Under BIPA:

> (d) No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless:
> > (1) the subject of the biometric identifier or biometric information or the subject's legally authorized representative consents to the disclosure or redisclosure[.]

74 ILCS § 14/15(d).

87.     Coinbase is a Delaware corporation and thus qualifies as a "private entity" under BIPA. *See* 740 ILCS § 14/10.

88.     Coinbase violated 740 ILCS § 14/15(d) by disclosing to the Third Party Verification Services, Plaintiffs' biometric identifiers and information, including but not limited to their face geometry scans, without Plaintiffs' consent.

89.     As explained in detail in Section I above, Plaintiffs' faceprints or face geometry are "biometric identifiers" pursuant to 740 ILCS § 14/10.

90.     Coinbase systematically disclosed Plaintiffs' biometric identifiers without first obtaining the specific written release required by 740 ILCS § 14/15(d).

27

91. By disclosing Plaintiffs' biometric identifiers as described herein, Coinbase violated Plaintiffs' right to privacy of these biometric identifiers, as set forth in BIPA, 740 ILCS § 14/1, *et seq*.

92. Plaintiffs seek: (i) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs by requiring Coinbase to comply with BIPA's requirements for the disclosure of biometric identifiers; (ii) statutory damages of $5,000 for this intentional violation of 740 ILCS § 14/15(d) of BIPA pursuant to 740 ILCS § 14/20(2), or at minimum, $1,000 for this negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (iii) attorneys' fees and costs, including expert witness fees and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## FOURTH CAUSE OF ACTION

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,
Based on Coinbase's BIPA Violation
(815 ILCS § 505/10a(c))**

93. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

94. Coinbase violated the Illinois Consumer Fraud and Deceptive Business Practices Act by engaging in unlawful, unfair and deceptive business acts and practices.

95. Specifically, Coinbase committed unfair and deceptive acts by surreptitiously generating, collecting, storing, and disclosing Plaintiffs' private information and data, which is a form of personal information under 815 ILCS § 530/5.

96. Coinbase does not provide notice of or obtain express consent to generating, collecting, storing or sharing biometric data or information.

97. By surreptitiously generating, collecting, storing, and sharing Plaintiffs' personal information, specifically biometric data, without express notice or consent, Coinbase has violated the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* 815 ILCS § 530/20; 815 ILCS § 505/10a(c).

28

98.     As a direct and proximate result of Coinbase's unfair, unlawful, and fraudulent acts and practices, Plaintiffs were injured.

99.     Plaintiffs seek all monetary and non-monetary relief allowed by law, including compensatory damages; restitution; punitive damages; and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Scott Bernstein, Gina Greeder, and James Lonergan, on behalf of themselves and the proposed Class, respectfully request that this Court enter and Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

B.     Declaring that Defendants' actions, as set out above, violate BIPA, 740 ILCS § 14/1, *et seq.*;

C.     Awarding liquidated damages of $5,000.00 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2), or alternatively, liquidated damages of $1,000.00 for each violation of BIPA pursuant to 740 ILCS § 14/20(1) if the Court finds that Defendants' violations were negligent;

D.     Awarding injunctive and other equitable relief as is necessary to protect the interests of the Class, including, *inter alia*, an Order requiring Defendants to collect, store, and use biometric identifiers and/or biometric information in compliance with BIPA;

E.     Awarding Plaintiffs and Class Members their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

F.     Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G.     Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: May 13, 2025          Respectfully submitted,

                    /s/ Mark R. Miller
                    Mark R. Miller
                    Matthew J. Goldstein
                    **WALLACE MILLER**
                    150 N. Wacker Drive
                    Suite 1100
                    Chicago, IL 60606
                    Telephone: 312-261-6193
                    mrm@wallacemiller.com
                    mjg@wallacemiller.com

                    *Local Counsel for Plaintiffs and the Proposed Class*

                    Jonathan Gardner (*pro hac vice* forthcoming)
                    Carol C. Villegas (*pro hac vice* forthcoming)
                    Jonathan D. Waisnor (*pro hac vice* forthcoming)
                    James M. Fee (*pro hac vice* forthcoming)
                    Danielle Izzo (*pro hac vice* forthcoming)
                    **LABATON KELLER SUCHAROW LLP**
                    140 Broadway
                    New York, NY 10005
                    Telephone: 212-907-0700
                    jgardner@labaton.com
                    cvillegas@labaton.com
                    jwaisnor@labaton.com
                    jfee@labaton.com
                    dizzo@labaton.com
                    Fax: 212-818-0477

                    *Attorneys for Plaintiffs and the Proposed Class*